NOTICE
Decision filed 02/18/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 250812-U

NOS. 5-25-0812, 5-25-0813 cons.

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| *In re* JAHM. L. and JAH'K. L., Minors | ) | Appeal from |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Coles County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | Nos. 23-JA-55, 23-JA-56 |
| | ) | |
| Etienne L., | ) | Honorable |
| | ) | Jonathan T. Braden, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

PRESIDING JUSTICE CATES delivered the judgment of the court.
Justices Hackett and Bollinger concurred in the judgment.

**ORDER**

¶ 1     *Held*:  The order of the circuit court of Coles County that terminated the parental rights of the respondent was not against the manifest weight of the evidence, and therefore this court affirms the judgment.

¶ 2     In this consolidated appeal, the respondent, Etienne L., contends that the circuit court of Coles County erred when it entered an order that terminated the respondent's parental rights to the two minor children, Jahm. L. and Jah'k. L., who are twins born in March of 2020. Specifically, the respondent contends that the circuit court's decision was against the manifest weight of the evidence with regard to the circuit court's finding of the respondent's unfitness, and the circuit court's finding that it was in the best interest of the minor twins for the respondent's parental rights to be terminated. For the reasons that follow, we affirm the judgment of the circuit court.

1

¶ 3                                I. BACKGROUND

¶ 4      Following an investigation into alleged methamphetamine use at the home the respondent shared with the twins and other family members, the twins were taken into protective custody. On November 3, 2023, the State filed, in circuit court case Nos. 23-JA-55 and 23-JA-56, neglect petitions and accompanying allegations, in which the State alleged that the twins were neglected because, *inter alia*, the respondent "abuse[d] illegal substances, namely methamphetamine," and because the family residence was "infested with bedbugs." Following a shelter care hearing, the circuit court entered orders in the cases finding that probable cause existed as to the allegations in the petitions that the twins were neglected as the result of illegal drug use in their home. The circuit court further determined that an immediate and urgent necessity existed for removing the twins from the home. A status hearing was set for November 17, 2023, and the Illinois Department of Children and Family Services (DCFS), or an affiliated agency, was ordered to prepare a 45-day case plan on or before December 15, 2023.

¶ 5      On January 19, 2024, an adjudicatory hearing was held. The mother of the twins, who is not a party to this appeal, stipulated to the allegations of neglect in the petitions, and the case proceeded to a dispositional hearing on April 26, 2024. At the outset of the hearing, the State requested that the circuit court enter an order consistent with the recommendations contained in a February 14, 2024, dispositional report submitted by Krystine Bowen of the organization One Hope United. Respondent's counsel stated that the respondent was "in agreement with the recommendations included in that report." The mother of the twins also agreed, and the order was entered by consent on that date. Of relevance to this appeal, the circuit court's agreed dispositional order required the respondent to, *inter alia*, (1) obtain a psychological evaluation and cooperate with treatment recommendations; (2) obtain a drug/alcohol assessment and cooperate with

treatment recommendations; (3) submit to random drug screens; (4) refrain from the use of all mind-altering substances, including alcohol, cannabis, and controlled substances except those prescribed by a licensed physician; (5) establish and maintain an appropriate, clean, healthy, and stable residence; and (6) undergo domestic violence and parenting education services. A permanency hearing was scheduled for October 18, 2024.

¶ 6    The respondent failed to appear at the October 18, 2024, permanency hearing. At this hearing, the circuit court considered the permanency report submitted to the court by Bowen of One Hope United on October 15, 2024. Of relevance to this appeal, the report indicated that the respondent had not attended any drug screens and had not signed a release of information to allow Bowen to determine whether the respondent was receiving substance abuse treatment services. According to the report, Bowen also was not able to determine if the respondent was receiving mental health treatment services or domestic violence treatment services, and Bowen had not received confirmation that the respondent had completed parenting education services. The report indicated that the respondent had exercised his right to supervised visitation with the twins, and Bowen opined that the respondent "loves his sons very much." The summary at the end of the report indicated that the respondent "has had numerous recent drug related charges and has not shown up to any drug screens." The report contained the recommendation that the permanency goal remain for the twins to return home within 12 months. The report asked the circuit court to find, *inter alia*, that the respondent had "not made reasonable and substantial efforts toward the return of the minors to the home." Following the hearing, over the objection of respondent's counsel, the circuit court entered a default written order consistent with the recommendations of the report, and found respondent had not made reasonable efforts toward returning the minors home.

3

¶ 7    The next status hearing in the case was held on February 21, 2025, with the respondent present. The State asked the circuit court to adopt the recommendations of the latest permanency report, which had been filed by Bowen on the previous day, February 20, 2025. Counsel for the respondent requested a contested hearing, but because said counsel had accepted a new position with a different agency, and would no longer be able to represent the respondent, the contested hearing was set for March 21, 2025, with new counsel appointed for the respondent. At the March 21, 2025, hearing, the respondent and his new counsel agreed to the recommendations in Bowen's February 20, 2025, report. The circuit court noted that the respondent was "in custody," which presented "a barrier," but asked the respondent if there were any other barriers that prevented him from complying with his service plan. The respondent stated that although he did have transportation issues, he had completed his parenting education course online and was on a waiting list for substance abuse treatment. Thereafter, the circuit court indicated that it would enter a permanency order consistent with the recommendations of Bowen's February 20, 2025, report. The court's written order contained a permanency goal of the return to home of the minors within 12 months, as well as a finding that the respondent had "not made reasonable and substantial progress toward" the return of the twins.

¶ 8    The next status hearing in the case was held on July 15, 2025. At the outset of the hearing, the circuit court noted that the case had been set "for a contested permanency hearing," but that on that morning, the State had filed a motion for the termination of the respondent's parental rights. The circuit court read the allegations of the motion to the respondent, noting that paragraph 8 of the motion alleged that the respondent was unfit because the respondent failed, during the time frames of January 19, 2024, to October 19, 2024, and October 19, 2024, to July 19, 2025, to make reasonable efforts to correct the conditions that led to the removal of the twins, and failed to make

4

reasonable progress toward the return of the twins during those same time frames. A hearing on the State's motion was set for August 22, 2025.

¶ 9     At the August 22, 2025, hearing, Bowen testified that she was a foster care case manager at One Hope United, and that "[s]ubstance abuse was the biggest issue" for both the respondent and the mother of the twins in this case. She testified that the general service plan goals for the respondent were "substance abuse, cooperation with the agency, domestic violence was originally on there, appropriate housing, legal income and parenting." She testified that when the respondent was not incarcerated, he was offered one hour of visitation with the twins, once a week. She testified that although the respondent was required by his service plan to submit to periodic drug screens, the respondent had not ever done so. She testified that although the respondent's service plan provided for the respondent to receive substance abuse treatment when he was not in prison, the respondent did not do so. Bowen further testified that the respondent had not satisfied any of the other aspects of his service plan, and that the respondent had never reported any employment to her. She testified that the respondent had not had visitation with the twins since "the end of last year, 2024." When asked if the respondent had ever provided financial support to the twins, Bowen testified, "During this case, not that I know of." Bowen was not aware of the respondent buying things like clothing for the twins, but noted that when not incarcerated, the respondent did bring snacks or buy food for the twins. She testified that during the time the respondent was incarcerated, he did not do so.

¶ 10     On cross-examination by counsel for the respondent, Bowen testified that the respondent never completed a DCFS-approved parenting class, although she conceded that the respondent completed an online course and submitted his proof of completion to her. She further conceded that it would have been "difficult if not impossible" for the respondent to comply with the

5

requirement of his service plan that he find adequate housing and have stable income while he was incarcerated from January 2025 up to the date of the hearing. She testified that she did not "have a lot of knowledge" about the respondent's criminal cases and did not know if he had been offered or denied substance abuse services, or mental health services, as part of those cases. Bowen agreed that during the respondent's present incarceration, the county jail informed her that due to construction issues, the respondent could not have visitation with the twins there, and Bowen further agreed that this was not the same as the respondent stating that he did not wish to visit the twins.

¶ 11   On cross-examination by counsel for Court Appointed Special Advocates (CASA), Bowen testified that the respondent's current incarceration was because of "drug charges." She agreed that the respondent had been incarcerated for "the greater portion" of the two nine-month time frames listed in the motion to terminate parental rights. On redirect examination, Bowen testified that during those time frames, the respondent did not progress to the extent that the twins were returned to his care. When asked if, during the times the respondent was not incarcerated, the respondent "completed or satisfied or was even working satisfactorily toward the satisfaction of services," Bowen testified, "No."

¶ 12   Kimberly Carmean testified that she was the executive director of CASA and had been for six years. She testified that she observed the respondent's visitation with the twins during a festival event in 2024. She testified that the respondent "did not appear to be very engaged with the children," that he "never really communicated with them like one on one," and that he "would bark orders at them when they were misbehaving or acting out, but for the most part, he didn't parent." When asked if the respondent had "engaged in any services that were recommended in his service plan," Carmean testified, "Not that I'm aware of, no." She testified that to her

knowledge, the respondent did not comply with any drug testing prior to his incarceration, and that the respondent had not made any efforts to correct the conditions that led to the removal of the twins.

¶ 13     On cross-examination by respondent's counsel, Carmean explained, with regard to the respondent's engagement with the twins during the festival, that in Carmean's opinion, the mother of the twins "did the majority of the parenting, addressing the children, making sure they were sitting down to eat, things like that," while the respondent "would kind of just be standing there, sometimes smoking a cigarette, sometimes on his phone, sometimes just, you know, just hanging out." She conceded that she "was not at every visit," and that the respondent did help with the parenting when the mother of the twins lost control of the situation. With regard to the rest of the respondent's service plan, Carmean conceded that she did not know what services were made available to the respondent.

¶ 14     The respondent testified that he was the father of the twins. He testified that he attempted to comply with his service plan by completing an online parenting course, and that he was told by someone at DCFS that the course would satisfy DCFS requirements. The respondent testified that during the time he was in prison, DCFS did not make any services available to him. He further testified that no services were made available to him during his subsequent incarceration, from January 2025 to the date of the hearing, at the Coles County Safety and Detention Center, and that he was not allowed visitation with the twins while incarcerated there. The respondent testified that during his current incarceration, he asked the circuit court in his criminal case for substance abuse and mental health evaluations, and that ultimately he received a substance abuse evaluation and was referred for residential treatment. He further testified that during the pendency of this case, at

all times when he was incarcerated, he was "ready, willing, and able to engage in services, had they been provided," and that he would have "loved" the opportunity for visitation with the twins.

¶ 15     On cross-examination by the State, the respondent conceded that he had a conviction for methamphetamine possession, and that he currently was facing charges of "one Class X, one Class 1, three Class 2 felonies, two Class 3 felonies, and three Class 4 felonies, all related to methamphetamine." On redirect examination, the respondent conceded that "clearly" he had a "history of substance abuse," but testified that he had been seeking treatment for his problems even before this case began. The circuit court then questioned the respondent, who indicated that he had been incarcerated in prison from November of 2023 to April 28, 2024, and in the county jail from January of 2025 until the present hearing. The respondent testified that between April of 2024 and January of 2025, he was also incarcerated "for short periods of time." When asked if he sought drug treatment during the times when he was not incarcerated, the respondent testified, "Absolutely, yes, sir." He testified that he sought outpatient treatment at the Hour House, but ultimately did not get treatment, adding, "[I]t's my fault that I didn't follow through the way that I should have." The respondent thereafter confirmed that he "didn't engage in any treatment" while he was "out of custody." When asked if he exercised his weekly visitation privileges with the twins during the times he was not incarcerated, the respondent testified, "Yes," then added, "I might have missed a couple of times."

¶ 16     Following the testimony of the witnesses, the parties presented their arguments. In response to argument from respondent's counsel that the respondent was not provided with adequate opportunities for services while incarcerated, the circuit court stated, "between April of 2024 and January of 2025, when he was not incarcerated, the results are exactly the same, so it's disingenuous to me to make the argument that because he's incarcerated, he's not able to engage

8

in the services, [because] when he wasn't incarcerated, he didn't either." The circuit court stated that prior to the respondent's current incarceration, the respondent did nothing to address his substance abuse problem, in response to which counsel for the respondent stated, "It's not that he did nothing," then added, "Obviously, he failed to follow through."

¶ 17 On September 12, 2025, the circuit court entered an order in which it found, *inter alia*, that based upon the evidence presented, the respondent "failed to make reasonable efforts or progress during either nine-month period." The circuit court found that the respondent failed to engage in any services and did not ever comply with random drug screens. The circuit court's order stated that "[e]ven during the time periods of the case where [the respondent] was not incarcerated, his visitation with the children was inconsistent." The order rejected the respondent's argument "that his lack of effort and progress can be attributed to his incarceration, which prohibited him from engaging in services," ruling that the respondent "made no efforts or progress during any nine-month period regardless of whether he was incarcerated." The circuit court found that, "[c]onsequently, the State has proven by clear and convincing evidence that [the respondent] is unfit."

¶ 18 On September 26, 2025, a best interests hearing was held. Bowen testified that the twins and their older half-sibling lived with Rebecca Caldwell in Sullivan. Bowen testified that she had made multiple visits to the home since placing the twins and their half-sibling there; that the home was adequate to meet the needs of the children; that Caldwell worked full-time and had passed a background check showing she had no criminal history; and that Bowen believed that all of the children's needs were being met. Bowen testified that Caldwell employed a "gentle parenting" approach, which was good because the children were "very rambunctious" and Caldwell was able to keep up with them and keep them calmed down. When asked if the twins had expressed concern

9

about living with Caldwell, Bowen testified, "No. They adore her." Bowen further testified that she had had email contact with the twins' teachers and that the twins were making "age-appropriate academic progress." When asked if she had "an opinion to a reasonable degree of professional certainty as to whether the best interests of the minor children [were] being met by them being fostered by Caldwell," Bowen testified that she did. In her opinion Bowen testified that the children were "thriving where they are at, that they are all happy and well taken care of as well." Bowen thereafter testified that Caldwell wished to adopt all three children.[1]

¶ 19     The respondent testified at the hearing as well. He testified that he believed that when he was released from his current incarceration, he would be able to provide for the twins' "physical and economic support." On cross-examination, he conceded that he was awaiting trial on his criminal charges and had not negotiated a settlement of those charges as of the date of the hearing.

¶ 20     Kimberly Carmean testified that as the CASA advocate assigned to the case, she visited the twins in Caldwell's home on multiple occasions. With regard to Caldwell's interactions with the twins, Carmean testified that Caldwell "does very well with them," because the twins "can be very high-strung, especially when new people come into the home," and Caldwell "is very patient with them, talks them kind of down sometimes if needed." Carmean added, "She's very good with them."

¶ 21     Following argument from the parties, the circuit court concluded, after considering the appropriate statutory factors, that Caldwell was meeting all of the needs of the twins with regard to those factors. The circuit court stated that it believed that both the respondent and the mother of the twins still loved the twins, but that "based on the evidence presented, [the twins] feel that attachment and love with Caldwell," where the twins "are thriving, they're happy, they're well

---

[1]The third child is the half-sibling of the twins, and is not a party to this appeal.

10

taken care of." With regard to the respondent's argument that the twins needed a male father figure in their lives, rather than being raised by Caldwell, the circuit court stated, "the reality is these kids haven't had that." The circuit court added, "They haven't had a positive male role model in their life as it relates to [the respondent]," because the respondent had "spent the majority of the boys' lives in prison, in jail." The circuit court further noted that even when the respondent was not incarcerated, "his visitation was inconsistent." The circuit court concluded that the State had met its burden of proof and stated that the motion to terminate parental rights would be granted. On October 3, 2025, the circuit court entered a written order terminating the parental rights of the respondent. This timely appeal followed.

¶ 22                                    II. ANALYSIS

¶ 23    On appeal, the respondent contends that the circuit court's decision to terminate his parental rights was against the manifest weight of the evidence. The respondent argues, *inter alia*, that "[t]he record demonstrates that [the respondent] completed a parenting education course in good faith, consistently participated in visitation when not incarcerated, and made repeated efforts to engage in services despite significant barriers beyond his control," and that the respondent "shares a strong bond with his children and is committed to providing them with love, stability and care." The State counters, *inter alia*, that the circuit court's findings and order were not against the manifest weight of the evidence that was presented to the circuit court. The State posits that the evidence supports the findings that (1) with regard to fitness, the respondent failed, during the time frames of January 19, 2024, to October 19, 2024, and of October 19, 2024, to July 19, 2025, to make reasonable efforts to correct the conditions that led to the removal of the twins; (2) the respondent likewise failed to make reasonable progress toward the return of the twins during those

11

time frames; and (3) termination of the respondent's parental rights was in the best interests of the twins. We agree with the State.

¶ 24     It is well established that parents have a fundamental liberty interest in the care, custody, and management of their children. See, *e.g.*, *In re D.T.*, 212 Ill. 2d 347, 363 (2004). Under certain circumstances, however, a circuit court has the authority to terminate parental rights involuntarily. The involuntary termination of parental rights under the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/1-1 *et seq.* (West 2024)) is a two-step process. *In re M.I.*, 2016 IL 120232, ¶ 20. The State must first prove by clear and convincing evidence that the parent is unfit under any of the discrete and independent grounds listed in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2024)). *M.I.*, 2016 IL 120232, ¶ 20; see also *In re C.W.*, 199 Ill. 2d 198, 217 (2002) ("the grounds set forth in section 1(D) each provide a discrete basis for a finding of unfitness"). Although the State may rely on several grounds in its motion to terminate parental rights, a finding adverse to the parent on any single ground is sufficient to support a subsequent termination of parental rights. *C.W.*, 199 Ill. 2d at 217. In other words, "only one ground of unfitness need be proved to find a parent unfit." *In re J.P.*, 261 Ill. App. 3d 165, 174 (1994).

¶ 25     If the court finds that a parent is unfit, the matter proceeds to a second hearing, at which the State must prove by a preponderance of the evidence that it is in the best interests of the minor children to terminate parental rights. *D.T.*, 212 Ill. 2d at 352, 366. At this stage of the proceedings, the circuit court's focus necessarily shifts to the best interests of the children and away from the rights of the parent. *In re P.S.*, 2021 IL App (5th) 210027, ¶ 30. "The parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life" (*D.T.*, 212 Ill. 2d at 364), because a prompt, just, and final resolution of a child's status, as

12

opposed to having that status remain in limbo, is in the child's best interests. *In re D.L.*, 191 Ill. 2d 1, 13 (2000).

¶ 26 On appeal, this court accords great deference to the circuit court's decisions in termination proceedings because the circuit court is in a better position to observe witnesses and to judge their credibility. *In re Dal. D.*, 2017 IL App (4th) 160893, ¶ 53. This court does not reweigh the evidence or reassess the credibility of witnesses. *In re M.A.*, 325 Ill. App. 3d 387, 391 (2001). Unless the circuit court's findings of parental unfitness or the child's best interest are against the manifest weight of the evidence, this court will not disturb the circuit court's findings. *In re A.W.*, 231 Ill. 2d 92, 104 (2008). A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly apparent or the determination is unreasonable, arbitrary, or not based on the evidence presented. *In re D.F.*, 201 Ill. 2d 476, 498 (2002).

¶ 27 In this case, we agree with the State that the circuit court did not err in finding that the respondent was unfit. One of the statutory grounds of unfitness in the Adoption Act is a parent's failure to make "reasonable progress" toward the return of the child during any nine-month period following the adjudication of neglect. 750 ILCS 50/1(D)(m)(ii) (West 2024). "Reasonable progress" is judged by an objective standard focused on the goal of returning the child to the parent. *In re D.D.*, 309 Ill. App. 3d 581, 589 (2000). The "benchmark" for measuring reasonable progress "encompasses the parent's compliance with the service plans and the court's directives, in light of the condition which gave rise to the removal of the child, and in light of other conditions which later become known and which would prevent the court from returning custody of the child to the parent." *In re C.N.*, 196 Ill. 2d 181, 216-17 (2001). "At a minimum, reasonable progress requires measurable or demonstrable movement toward the goal of reunification." *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1067 (2006). A parent has made reasonable progress when the circuit court, "in

13

the *near future*, will be able to order the child returned to parental custody." (Emphasis in original.) *In re L.L.S.*, 218 Ill. App. 3d 444, 461 (1991).

¶ 28 The circuit court in this case found that the respondent had not made reasonable progress during either nine-month time frame alleged in the State's petition. Bowen testified that although the respondent was required by his service plan to submit to periodic drug screens, the respondent never did so. She testified that although the respondent's service plan provided for the respondent to receive substance abuse treatment when he was not in prison, the respondent did not do so. Bowen further testified that the respondent had not satisfied any of the other aspects of his service plan, and that the respondent had never reported any employment to her. On redirect examination, Bowen testified that during the two nine-month time frames, the respondent did not progress to the extent that the twins were returned to his care. When asked if, during the times the respondent was not incarcerated, the respondent "completed or satisfied or was even working satisfactorily toward the satisfaction of services," Bowen testified, "No."

¶ 29 CASA advocate Carmean provided testimony consistent with that of Bowen. When asked if the respondent had "engaged in any services that were recommended in his service plan," Carmean testified, "Not that I'm aware of, no." She testified that to her knowledge, the respondent did not comply with any drug testing prior to his incarceration, and that the respondent had not made any efforts to correct the conditions that led to the removal of the twins.

¶ 30 The testimony of the respondent, when questioned directly by the circuit court, also supports the finding made in the judgment. When asked if he sought drug treatment during the times when he was not incarcerated, the respondent first testified, "Absolutely, yes, sir," but thereafter testified that he sought outpatient treatment at the Hour House, although ultimately he did not get treatment. He acknowledged, "[I]t's my fault that I didn't follow through the way that

14

I should have," and then confirmed that he "didn't engage in any treatment" while he was "out of custody." When asked if he exercised his weekly visitation privileges with the twins during the times he was not incarcerated, the respondent testified, "Yes," but then added, "I might have missed a couple of times."

¶ 31    In light of the foregoing testimony, the circuit court did not err in concluding that the respondent failed to engage in any services required by his service plan, including the failure by respondent to provide random drug screens. Moreover, the circuit court did not err when it concluded that the evidence showed that "[e]ven during the time periods of the case where [the respondent] was not incarcerated, his visitation with the children was inconsistent," and that the respondent "made no efforts or progress during any nine-month period regardless of whether he was incarcerated." The evidence clearly demonstrates that the circuit court "in the near future" would not be able to order the twins returned to the respondent's custody, and thus that the respondent failed to make reasonable progress toward the return of the minors to respondent's home. See *L.L.S.*, 218 Ill. App. 3d at 461.

¶ 32    In reaching these conclusions, we reiterate that the circuit court was in the best position to judge the credibility of the witnesses, including the respondent (see *Dal. D.*, 2017 IL App (4th) 160893, ¶ 53), and that we will not reweigh the evidence or reassess the credibility of those witnesses. *M.A.*, 325 Ill. App. 3d at 391. The opposite conclusion to that reached by the circuit court in this case is not clearly apparent, and the circuit court's determination is not unreasonable, arbitrary, or not based on the evidence presented; accordingly, the circuit court's finding is not against the manifest weight of the evidence (see *D.F.*, 201 Ill. 2d at 498), and we will not disturb it. *A.W.*, 231 Ill. 2d at 104. As noted above, "only one ground of unfitness need be proved to find

a parent unfit" (*J.P.*, 261 Ill. App. 3d at 174), and it is upon the ground of lack of reasonable progress during either nine-month period that we affirm the finding of unfitness in this case.

¶ 33     Likewise, we conclude that the circuit court's decision regarding the best interests of the twins was not against the manifest weight of the evidence. The circuit court specifically stated that it had considered the requisite statutory factors, and ample evidence supported the circuit court's decision. Bowen testified that the twins and their older half-sibling lived with Caldwell in Sullivan. Bowen testified that she had made multiple visits to the home since placing the twins and their half-sibling there, that the home was adequate to meet the needs of the children, that Caldwell worked full-time and had passed a background check showing she had no criminal history, and that Bowen believed that all of the children's needs were being met. Bowen testified that Caldwell employed a "gentle parenting" approach, which was good because the children were "very rambunctious" and Caldwell was able to keep up with them and keep them calmed down. When asked if the twins had expressed concern about living with Caldwell, Bowen testified, "No. They adore her." Bowen further testified that she had had email contact with the twins' teachers and that the twins were making "age-appropriate academic progress." When asked if she had "an opinion to a reasonable degree of professional certainty as to whether the best interests of the minor children [were] being met by them being fostered by Caldwell," Bowen testified that she did, and that her opinion was that the children were "thriving where they are at, that they are all happy and well taken care of as well." Bowen thereafter testified that Caldwell wished to adopt all three children.

¶ 34     The testimony of CASA advocate Carmean was consistent with that of Bowen. Carmean testified that she visited the twins in Caldwell's home on multiple occasions. With regard to Caldwell's interactions with the twins, Carmean testified that Caldwell "does very well with

16

them," because the twins "can be very high-strung, especially when new people come into the home," and Caldwell "is very patient with them, talks them kind of down sometimes if needed." Carmean added, "She's very good with them."

¶ 35 Although the respondent testified that he believed that when he was released from his current incarceration, he would be able to provide for the twins' "physical and economic support," he conceded on cross-examination that he was awaiting trial on multiple felony charges, and had not negotiated a settlement of those charges as of the date of the hearing. Thus, the respondent could not predict with any accuracy when his current incarceration might end, and the circuit court could have concluded that any future ability of the respondent to care for, and provide support for, the twins was highly speculative. Under such circumstances, it would not be error for the circuit court to conclude that continuing the parental rights of the respondent was not a viable option that was in the best interests of the twins.

¶ 36 Moreover, following argument from the parties, the circuit court concluded that Caldwell was meeting all of the needs of the twins with regard to the statutory factors. The circuit court stated that it believed that both the respondent and the mother of the twins still loved the twins, but that "based on the evidence presented, [the twins] feel that attachment and love with Caldwell," where the twins "are thriving, they're happy, they're well taken care of." With regard to the respondent's argument that the twins needed a male father figure in their lives, rather than being raised by Caldwell, the circuit court stated, "the reality is these kids haven't had that." The circuit court added, "They haven't had a positive male role model in their life as it relates to [the respondent]," because the respondent had "spent the majority of the boys' lives in prison, in jail." The circuit court further noted that even when the respondent was not incarcerated, "his visitation was inconsistent."

17

¶ 37    We again emphasize that the circuit court was in the best position to judge the credibility of the witnesses, including the respondent. *Dal. D.*, 2017 IL App (4th) 160893, ¶ 53. We will not reweigh the evidence or reassess the credibility of those witnesses. *M.A.*, 325 Ill. App. 3d at 391. The opposite conclusion to that reached by the circuit court in this case is not clearly apparent, and the circuit court's determination is not unreasonable, arbitrary, or not based on the evidence presented; accordingly, the circuit court's finding is not against the manifest weight of the evidence (see *D.F.*, 201 Ill. 2d at 498), and we decline to disturb it. *A.W.*, 231 Ill. 2d at 104.

¶ 38                                    III. CONCLUSION

¶ 39    For the foregoing reasons, we affirm the judgment of the circuit court of Coles County.


¶ 40    Affirmed.